# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, *ex rel*. PATRICIA SCOTT and JOHN L. TUDBURY,<br><br>  *Plaintiffs*,<br><br>   v.<br><br>PACIFIC ARCHITECTS AND ENGINEERS (PAE), INC. dba PAE Government Services, Inc, aka PAE Group,<br><br>  *Defendant*. | Civil Action No. 13-1844 (CKK) |

## MEMORANDUM OPINION AND ORDER
(September 13, 2017)

In this action under the False Claims Act ("FCA"), 31 U.S.C. §§ 3729–3733, Relators Patricia Scott and John L. Turbury principally allege that Defendant Pacific Architects and Engineers, Inc. ("PAE") engaged in improper billing practices in Beirut, Lebanon pursuant to civil police training contracts awarded by the Department of State. Pending before the Court is Defendant's [33] Motion to Dismiss the Second Amended Complaint, brought pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6). Upon consideration of the pleadings,[1] the relevant legal authorities, and the record for purposes

---

[1] The Court's consideration has focused on the following documents:

- Second Am. Compl., ECF No. 30 ("Compl.");
- Mem. of P&A in Supp. of Mot. to Dismiss the Second Am. Compl., ECF No. 33 ("Def.'s Mem.");
- Mem. in Supp. of Opp'n to Def.'s Mot. to Dismiss Relators' Second. Am. Compl., ECF No. 34-1 ("Opp'n Mem.");
- Reply Mem. in Response to Pl.'s Opp'n to Def.'s Mot. to Dismiss the Second Am. Compl., ECF No. 35 ("Reply Mem.");
- Statement of Material Disclosure by Patricia Scott, ECF No. 1 at 17–30 ("Ex. A");
- Statement of Material Disclosure by John L. Tudbury, ECF No. 1 at 32–40 ("Ex. B").

1

of the pending motion, the [33] Motion to Dismiss is **GRANTED-IN-PART** and **DENIED-IN-PART**. As explained further below, Relators' claim pursuant to section 3729(a)(1)(G), and Relator Tudbury's claim pursuant to section 3730(h), are dismissed without prejudice. However, Relators have stated viable claims pursuant to sections 3729(a)(1)(A) and 3729(a)(1)(B), and Relator Scott has stated a viable retaliation claim pursuant to section 3730(h).

## I. BACKGROUND

The following factual narrative is gleaned from the allegations of the complaint, which are taken as true solely for purposes of the pending motion.

Defendant is "a company operating in 45 countries that has many contracts with the United States for logistics, construction, services including peace keeping, justice programs, capacity building, and international policing programs." Compl. ¶ 8. Since 2007, the Department of State's Bureau of International Narcotics and Law Enforcement Affairs ("INL") has awarded Defendant contracts to provide civil police training and administrative services in Beirut, Lebanon, among other locations around the world. *Id*. ¶ 9. Relator Scott worked for Defendant in Lebanon from February to August 2011 as a Human Resource and Administrative Manager. Ex. A, ¶ 3. Relator Tudbury worked for Defendant in Lebanon from October 2009 to October 2011 as an International Police Trainer. Ex. B, ¶ 3. The crux of Relators' allegations is that from approximately December 2007 to December 2011, Defendant submitted false claims for reimbursement, on a monthly basis, pursuant to the civilian police contracts awarded by INL. Relators allege that this conduct was facilitated by PAE employees Thomas Barnes, who was a Deputy

Program Manager in Lebanon, and Dan Moritz, who was a Program Manager in Lebanon. Compl. ¶ 12.

In particular, Relators allege that Defendant routinely falsified GSA 139 forms, which Defendant used to record the hours worked by its personnel and to seek compensation when invoicing the government. Compl. ¶ 16. Several strategies were allegedly used to have personnel record hours when they were not actually working. One such strategy was a system of "team building" exercises. *Id*. ¶ 35. According to the complaint, PAE management would "send out emails for 'team building' events as a facade to hide the fact that their employees were going on hikes and sightseeing (including trips to Byblos and other sites) and shopping trips, all the while billing hours worked to the U.S. Government." *Id*. At a June 2011 meeting, Mr. Moritz allegedly suggested how certain non-work could be called "team building" and thereby invoiced to the government. *Id*. ¶ 36. Relator Scott recalls that Mr. Barnes said that "you have to be 'creative' with your billing and . . . gave the example that if you go to the mall you should record the time on the timesheet and call it 'Team Building.'" *Id*. ¶ 37. According to Relator Scott, although training classes were not held on Friday or Saturday, Defendant "billed the government using fictitious time sheets [that] they instructed the employees to fill out as if they worked full days. Instead of working, employees went out on the town. This was done with the knowledge, approval and participation of management." Ex. A, ¶ 10.

Another alleged strategy was to mark employees as "available" for work, and thereby bill for their services, even though they were not actually present and ready to work. Compl. ¶ 34. In particular, Relator Scott alleges that Lebanese nationals employed by Defendant did not work on Saturdays, but that Defendant nonetheless billed for those

days. Ex. A, ¶ 24. On other occasions, Relator Scott was allegedly required to mark employees as "available" for work, even though they were not. *Id*. The complaint lists numerous examples of this behavior, by employee name and date. Compl. ¶ 34. This allegation is corroborated by the statement of Relator Tudbury, who alleges that "we were supposed to submit time sheets for 8 hours of work, 6 days a week, which is what the contract with [the Department of State] called for." Ex. B, ¶ 9. He recounts that although "we were required to have academies for local police on Saturdays, there were no academies on Saturdays when I worked there. This was because we had no cadets (locals) who were there on that day. [Defendant] was aware [that] the cadets were off on Saturdays due to Lebanese custom and religious practices." *Id*. ¶ 11. According to Relator Tudbury, out of approximately "70 foreign workers, there were about 50 who were billing for Saturdays and for 2 week breaks where no work was done." *Id*. ¶ 19. Harkening back to Relator Scott's allegations regarding the "team building" strategy, Relator Tudbury alleges that Defendant instructed him to find another way to bill time on Saturdays, such as by going to the gym and checking his emails, and labeling the time as "Team Building." *Id*. ¶ 13. He recalls a particular occasion on which Mr. Moritz and Mr. Barnes provided suggestions for how to address time billing issues with auditors. *Id*. ¶ 14. One suggestion was that if a "company guy calls for [a] team meeting, [and it] only lasts an hour, [you] can charge 8 hours." *Id*. According to Relator Tudbury, Mr. Moritz and Mr. Barnes referred to this practice as "creative billing." *Id*.

Another alleged example of billing impropriety occurred between December 2009 and January 2010. According to the complaint, "Defendant submitted time sheets for the period of December 28, 2009 through January 31, 2010 requesting reimbursement for time

worked by its employees who worked as 'International Trainers' for the period of December 15, 2009 through January 26, 2010 even though Defendant knew [that] International Trainers did not work from December 15, 2009 through January 26, 2010 as they were not scheduled to do so nor were any . . . classes . . . held during this period." Compl. ¶ 27. The complaint provides a list of trainer names, dates, and the number of hours allegedly billed inappropriately to the government. *Id*. Similar allegations are made for several other time periods. *Id*. ¶¶ 28–29.

Other improprieties are also alleged. According to the complaint, "Relator Tudbury and other employees were instructed by PAE management (and specifically David Kynoch) to submit time sheets prior to the end of the period of the time sheet—thus requiring PAE employees to fabricate at least one week of time worked." *Id*. ¶ 30. The complaint specifies which of Relator Tudbury's timesheets were affected by this practice. *Id*. Relators also allege that Defendant hired personnel in Lebanon that did not meet the minimum requirements for their jobs, and three specific examples are provided. *Id*. ¶¶ 42–48. They further allege that on several occasions, drivers paid for by the government were used by Defendant's employees—in particular, Mr. Barnes—for recreational purposes unrelated to government work. *Id*. ¶ 49. Three specific examples, with dates, descriptions, and sources of information, are provided. *Id*. Relators also allege that Defendant encouraged employees to purchase exorbitantly priced airfare, despite the availability of lower-priced options, because Defendant received ten percent of the purchase price. This practice was allegedly contrary to Defendant's internal policy and the Fly America Act, 49 U.S.C. § 40118. *Id*. ¶¶ 50–56. The specifics of two tickets allegedly purchased pursuant to this practice are described in the complaint. *Id*. ¶ 56.

Finally, Relators allege that they were terminated in retaliation for their efforts to investigate the allegedly fraudulent activities described above. *Id.* ¶¶ 57–75.

## II. LEGAL STANDARD

### A. Motion to Dismiss for Failure to State a Claim

Defendant moves to dismiss the complaint for "failure to state a claim upon which relief can be granted" pursuant to Federal Rule of Civil Procedure 12(b)(6). "[A] complaint [does not] suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007)). Rather, a complaint must contain sufficient factual allegations that, if accepted as true, "state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

In deciding a Rule 12(b)(6) motion, a court may consider "the facts alleged in the complaint, documents attached as exhibits or incorporated by reference in the complaint," or "documents upon which the plaintiff's complaint necessarily relies even if the document is produced not by the plaintiff in the complaint but by the defendant in a motion to dismiss." *Ward v. District of Columbia Dep't of Youth Rehab. Servs.*, 768 F. Supp. 2d 117, 119 (D.D.C. 2011) (internal quotation marks omitted). The Court shall consider for purposes of the pending motion the Statement of Material Disclosure by Patricia Scott, ECF No. 1 at 17–30, and the Statement of Material Disclosure by John L. Tudbury, *id.* at 32–40. These documents are expressly incorporated by reference in the complaint. *See* Compl. ¶ 25.

### B. Pleading a Fraud Claim Pursuant to Federal Rule of Civil Procedure 9(b)

"Complaints brought under the FCA must . . . comply with Rule 9(b)." *United States ex rel. Landis v. Tailwind Sports Corp.*, 51 F. Supp. 3d 9, 49 (D.D.C. 2014) (citing *United States ex rel. Totten v. Bombardier Corp.*, 286 F.3d 542, 551–52 (D.C. Cir. 2002)). Rule 9(b) states that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." "Reading Rule 9(b) together with Rule 8's requirement that allegations be 'short and plain,' . . . the D.C. Circuit has required plaintiffs to 'state the time, place and content of the false misrepresentations, the fact misrepresented and what was retained or given up as a consequence of the fraud,' and to 'identify individuals allegedly involved in the fraud.'" *United States ex rel. Morsell v. Symantec Corp.*, 130 F. Supp. 3d 106, 117 (D.D.C. 2015) (citing *United States ex rel. Williams v. Martin-Baker Aircraft Co., Ltd.,* 389 F.3d 1251, 1256 (D.C. Cir. 2004)). "Put more colloquially, an FCA plaintiff must identify the 'who, what, when, where, and how of the alleged fraud.'" *United States v. Kellogg Brown & Root Servs., Inc.*, 800 F. Supp. 2d 143, 153 (D.D.C. 2011) (quoting *U.S. ex rel. Wilson v. Kellogg Brown & Root, Inc.*, 525 F.3d 370, 379 (4th Cir. 2008)).

As recently explained by the D.C. Circuit, "the point of Rule 9(b) is to ensure that there is sufficient substance to the allegations to both afford the defendant the opportunity to prepare a response and to warrant further judicial process." *United States ex rel. Heath v. AT&T, Inc.*, 791 F.3d 112, 125 (D.C. Cir. 2015). Accordingly, "Rule 9(b) does not inflexibly dictate adherence to a preordained checklist of 'must have' allegations." *Id*. "In sum, although Rule 9(b) does not require plaintiffs to allege every fact pertaining to every instance of fraud when a scheme spans several years, defendants must be able to defend

against the charge and not just deny that they have done anything wrong." *Williams*, 389 F.3d at 1259 (internal quotation marks omitted).

## III. DISCUSSION

The Court proceeds by analyzing in turn the statutory claims under the FCA that are alleged in the complaint. Although Defendant challenges the complaint on a count-by-count basis, many of the counts merely state different theories of recovery under the same statutory section. To the extent the Court determines that a statutory claim can proceed on at least one theory of liability, it offers no opinion as to the viability of the other theories alleged in the complaint. *See Tailwind*, 51 F. Supp. 3d at 51 ("Because the Court concludes the claims were false under the theory of implied certification, it need not address whether the claims were also false under the theory of fraudulent inducement."); *United States ex rel. Wilkins v. United Health Group, Inc.*, 659 F.3d 295, 313 (3d Cir. 2011) ("[W]e need not decide whether the amended complaint states a claim under an express false certification theory because appellants' allegations in the amended complaint clearly state a claim for relief under an implied false certification theory of liability.")

   A.  *Sections 3729(a)(1)(A) and 3729(a)(1)(B) – False Claims and Statements*

Section 3729(a)(1)(A) of the FCA creates liability for "any person who . . . knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval." 31 U.S.C. § 3729(a)(1)(A). The prototypical case under section 3729(a)(1)(A) is known as a "presentment" action. *See Pencheng Si v. Laogai Research Found.*, 71 F. Supp. 3d 73, 87 (D.D.C. 2014). The elements of a presentment claim are that "(1) the defendant submitted or caused to be submitted a claim to the government, (2) the claim was false, and (3) the defendant knew the claim was false." *Morsell*, 130 F. Supp. 3d at

118 (internal quotation marks omitted). "In the paradigmatic case, a claim is false because it involves an incorrect description of goods or services provided or a request for reimbursement for goods or services never provided." *United States v. Sci. Applications Int'l Corp.*, 626 F.3d 1257, 1266 (D.C. Cir. 2010).

Here, the Court finds that the Relators have stated a plausible claim under section 3729(a)(1)(A) that meets the requirements of Rule 9(b). In particular, Relators have plausibly alleged that over the course of several years, Defendant billed time to the federal government for hours that were not actually worked by its personnel in Lebanon. A specific time period is alleged—December 2007 to December 2011—and Relators allege that invoices were submitted on a monthly basis. Relators have described in fair detail the allegedly fraudulent strategies by which time was inappropriately logged and invoiced. In particular, Defendant allegedly engaged in fictitious team building exercises, marked employees as "available" even though they were not, and billed time for training sessions when those session were not being held. Relators have alleged that two PAE employees advocated these practices: Thomas Barnes, a Deputy Program Manager, and Dan Moritz, a Program Manager, both in Lebanon. And they have specified some of the particular occasions on which Mr. Barnes and Mr. Moritz spoke in favor of these practices. Furthermore, with respect to billing for non-existent training sessions, Relators have alleged specific time frames during which this practice allegedly took place. True, they have not specified every detail of every particular instance of billing fraud—but they have provided notice of the general time period (when), the contracts and location affected (what and where), some of the employees involved (who), and concrete details on how the fraud was allegedly perpetrated (how). In the Court's view, this satisfies Rules 9(b) and 12(b)(6).

The claim is plausible, and Defendant has been provided sufficient information in order to mount a defense. *See, e.g., United States ex rel. Tran v. Computer Scis. Corp.*, 53 F. Supp. 3d 104, 123 (D.D.C. 2014) ("To be sure, the complaint does not relate the specific dates on which [defendant] submitted each of the invoices, but Rule 9(b) does not require as much."); *United States ex rel. Harris v. Bernad*, 275 F. Supp. 2d 1, 8-9 (D.D.C. 2003) (finding that "[b]ecause the defendants' scheme is complex and has lasted for a number of years, the allegation of a span of time is sufficient" to survive a motion to dismiss pursuant to Rule 9(b)); *Heath*, 793 F.3d at 125 ("The complaint makes clear . . . that corporate levers were pulled; identifying precisely who pulled them is not an inexorable requirement of Rule 9(b) in all cases."); *id*. at 126 ( "the precise details of individual claims are not, as a categorical rule, an indispensable requirement of a viable False Claims Act complaint").

Other theories of liability under section 3729(a)(1)(A) are presented in the complaint, including certification and inducement theories, which are alternative means by which a claim under section 3729(a)(1)(A) may proceed. *Pencheng*, 71 F. Supp. 3d at 87 (noting that fraudulent inducement and false certification are some of the alternative "possible theories that can support liability under section 3729(a)(1)(A)"). Because the Court finds that Relators have stated a viable presentment claim under section 3729(a)(1)(A), it offers no view as to the viability of those other theories.

The Court also finds that Relators have stated a viable claim pursuant to section 3729(a)(1)(B), which imposes liability on any person who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1)(B). This claim is "complementary" to one under section 3729(a)(1)(A), and accordingly, "the elements for a count brought under section

3729(a)(1)(B) are practically identical to the requirements for a count brought under section 3729(a)(1)(A)." *Pencheng*, 71 F. Supp. 3d at 87. The principal difference between the two claims is that section 3729(a)(1)(A) imposes liability for false claims, while section 3729(a)(1)(B) imposes liability for a knowingly false "record or statement that was 'material' to a false or fraudulent claim." *Morsell*, 130 F. Supp. 3d at 122 (citation omitted). "The false statements provision is 'designed to prevent those who make false records or statements . . . from escaping liability solely on the ground that they did not themselves present a claim for payment or approval.'" *Id*. at 122–23 (citing *Totten v. Bombardier Corp.*, 380 F.3d 488, 501 (D.C. Cir. 2004)). Here, for the reasons already stated, Relators have plausibly alleged, with sufficient particularity, that Defendant submitted fraudulent billing statements and claims to the federal government.

### B. Section 3729(a)(1)(G) – "Reverse" FCA Claim

A reverse false claim arises when a person "knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government." 31 U.S.C. § 3729(a)(1)(G). In other words, "[a] reverse false claim is any fraudulent conduct that 'results in no payment to the government when a payment is obligated.'" *Pencheng*, 71 F. Supp. 3d at 88 (quoting *Hoyte v. Am. Nat'l Red Cross,* 518 F.3d 61, 63 n.1 (D.C. Cir. 2008)) (internal quotation marks omitted). "Whereas a traditional false claim action involves a false or fraudulent statement made to the government to support a claim for money from the government, a typical reverse false claim action involves a defendant

knowingly making a false statement in order to *avoid* having to pay the government when payment is otherwise due." *Id.* (emphasis in original).

Here, Relators attempt to stake out a reverse FCA claim by alleging that Defendant "knowingly . . . submitted invoices to the U.S. government which included expenses for Relators' medical examinations, but Defendant[] did not properly reimburse Relators for such medical expenses." Compl. ¶ 144. In Relators' view, Defendant "knowingly concealed that that the correct reimbursement amounts were not paid to Relators and knowingly avoided reimbursement to the U.S. Government for amounts not reimbursed to Relators." *Id*. ¶ 145. In other words, Defendant allegedly failed to reimburse the government for the amounts that Defendant improperly received from the government for medical examinations. This line of reasoning, however, would turn every direct FCA claim pursuant to section 3729(a)(1)(A) into a "reverse" claim pursuant to section 3729(a)(1)(G), for the simple reason that whenever funds are fraudulently obtained, the recipient of those funds can be described as depriving the government of the funds. Consequently, this Court has previously held that the mere allegation "that Defendants fraudulently concealed their original false claim . . . and thereby prevented the government from discovering that fraud is not by itself enough to establish an 'obligation' to return the credit for the purposes of a reverse false claim action." *United States v. Newman*, No. CV 16-1169 (CKK), 2017 WL 3575848, at *9 (D.D.C. Aug. 17, 2017); *see also Pencheng*, 71 F. Supp. 3d at 97 ("if the conduct that gives rise to a traditional presentment or false statement action also satisfies the demands of section 3729(a)(1)(G), then there would be nothing 'reverse' about an

action brought under that latter section of the FCA"). Accordingly, the Court shall dismiss without prejudice Relators' claim pursuant section 3729(a)(1)(G).[2]

## C. Section 3730(h) – Retaliation under the FCA

To state a retaliation claim pursuant to section 3730(h) of the FCA, "the employee must show: (1) that he engaged in protected activity ('acts done . . . in furtherance of an action under this section'); and (2) that he experienced discrimination 'because of' his protected activity." *Shekoyan v. Sibley Int'l*, 409 F.3d 414, 422 (D.C. Cir. 2005) (quoting 31 U.S.C. § 3730(h)). As to the first element, "while the employee must be investigating matters which are calculated, or reasonably could lead, to a viable FCA action, it is not necessary for a plaintiff to know that the investigation could lead to a False Claims Act suit." *Id.* (internal quotation marks, citations, and alterations omitted). Nonetheless, "[m]ere dissatisfaction with one's treatment on the job is not . . . enough." *United States ex rel. Yesudian v. Howard Univ.*, 153 F.3d 731, 740 (D.C. Cir. 1998). "Nor is an employee's investigation of nothing more than his employer's non-compliance with federal or state regulations. . . . To be covered by the False Claims Act, the plaintiff's investigation must concern 'false or fraudulent' claims." *Id.* (citations omitted). Furthermore, "[t]o establish the second element, the employee must demonstrate that the employer had knowledge of

---

[2] Defendant asks that, to the extent claims are dismissed, that the dismissal be *with prejudice*. Def.'s Mem. at 34. "[T]he standard for dismissing a complaint with prejudice is high: dismissal *with prejudice* is warranted only when the allegation of other facts consistent with the challenged pleading could not possibly cure the deficiency." *Rudder v. Williams*, 666 F.3d 790, 794 (D.C. Cir. 2012) (internal quotation marks and alterations in original omitted). Here, the Court is not convinced that the provision of additional factual allegations would not serve to cure the deficiencies with the complaint identified by the Court. Accordingly, the deficient claims shall be dismissed *without prejudice*.

13

the employee's protected activity and that the retaliation was motivated by the protected activity." *Shekoyan*, 409 F.3d at 422.

With respect to Relator Scott, Defendant contends that because she "was a Human Resource and Administrative Manager," and because "she was responsible for reviewing employee timesheets and accountability reports," "[i]nsofar as she complained about 'improper' billing of labor costs or other potential FCA violations, Scott was merely informing her supervisors of a problem, not engaging in protected activity." Def.'s Mem. at 33. Defendant further contends that Relators have failed to establish a causal link between the protected activity and Relator Scott's termination, "because she admits in her declaration that [the Department of State] (not PAE) eliminated her position on the Lebanon Task Order." *Id*.

"[P]laintiffs alleging that performance of their normal job responsibilities constitutes protected activity must overcome the presumption that they are merely acting in accordance with their employment obligations to put their employers on notice." *Williams*, 389 F.3d at 1261 (internal quotation marks omitted). "While threatening to file a qui tam suit or to make a report to the government clearly is one way to make an employer aware, it is not the only way, as when an employee acts outside her normal job responsibilities or alerts a party outside the usual chain of command, such action may suffice to notify the employer that the employee is engaging in protected activity . . . ." *Omwenga v. United Nations Found.*, --- F. Supp. 3d ---, No. 15-CV-0786 (TSC), 2017 WL 1154954, at *2 (D.D.C. Mar. 27, 2017) (internal quotation marks, citations, and alterations omitted). Here, Relator Scott alleges that she was expressly told by her supervisor that she was acting outside the scope of her employment by raising concerns regarding Defendant's

billing practices. *See* Ex. A, ¶ 15 ("I complained to Mr. Barnes . . . about what was going on with the falsification of time sheets . . . . Barnes sent me an email saying [that] I am not [the] HR manager, just the Administrative Manager."). Consequently, and contrary to Defendant's position, there is no real question that Relator Scott has plausibly alleged that Defendant was on notice of her investigatory activities, even though those activities, at least theoretically, could have been part of her job description. Furthermore, Relator Scott has plausibly alleged a causal connection between her investigatory activities and her termination. In particular, Relator Scott alleges that after she "wrote a complaint to the company about billing fraud . . . Barnes start[ed] saying [that the Department of State] was going to eliminate [her] position." *Id*. ¶ 40. She further alleges that "[a]t one time [the Department of State was] apparently going to eliminate [her position], but PAE talked them out of it to make more money." *Id*. After Relator Scott was informed by Defendant that her position was terminated, she was told by an official with the Department of State that he "didn't know [she was] there, I told them before I didn't want anyone in that position, [I] want [a] local national in that position." *Id*. ¶ 41. Drawing all reasonable inferences in favor of Relator Scott, and taking these allegations as true, the Court finds that she has plausibly alleged that Defendant, and not the Department of State, was the driving force behind her termination.

As to Relator Tudbury, Defendant contends that his retaliation claim cannot proceed because he concedes that he "left PAE's employment voluntarily on October 15, 2011 because of the problems of the time sheet fraud and misconduct of Thomas Barnes, Deputy Program Manager." Ex. B, ¶ 8. This statement contradicts the allegation in the complaint that "Relator Tudbury was fired by Steve Fletcher of PAE Corporate and his last

15

day of work was October 15, 2011." Compl. ¶ 64. The Court need not "accept as true the complaint's factual allegations insofar as they contradict exhibits to the complaint . . . ." *Kaempe v. Myers*, 367 F.3d 958, 963 (D.C. Cir. 2004).

Furthermore, the other allegations of retaliatory conduct against Relator Tudbury are vague and conclusory. Notably, although Mr. Tudbury alleges that he was "sent home early [on October 15, 2011] . . . [as] a direct result of reporting misconduct to PAE concerning DPM Barnes," this statement directly contradicts his assertion that he voluntarily left Defendant's employ on that date, and no additional factual details are provided regarding the circumstances of his departure from PAE. *See Acosta Orellana v. CropLife Int'l*, 711 F. Supp. 2d 81, 109 (D.D.C. 2010) ("where some allegations in the complaint contradict other allegations, the conflicting allegations become naked assertions devoid of further factual enhancement . . . , which therefore cannot be presumed true" (internal quotation marks and alterations omitted)). Accordingly, the Court finds that Relator Tudbury has failed to plausibly allege a retaliatory act, and consequently dismisses, without prejudice, his retaliation claim pursuant section 3730(h) of the FCA. To the extent Relator Tudbury is able to clarify the factual allegations regarding his departure from PAE, he may seek leave to amend the complaint.

## IV. CONCLUSION AND ORDER

For the foregoing reasons, the [33] Motion to Dismiss is **GRANTED-IN-PART** and **DENIED-IN-PART**. Relators' claim pursuant to section 3729(a)(1)(G), and Relator Tudbury's claim pursuant to section 3730(h), are **DISMISSED WITHOUT PREJUDICE**. However, Relators have stated viable claims pursuant to sections

3729(a)(1)(A) and 3729(a)(1)(B), and Relator Scott has stated a viable retaliation claim pursuant to section 3730(h).[3]

                                                       /s/
                                    COLLEEN KOLLAR-KOTELLY
                                    United States District Judge

---

[3] For the sake of clarity, the Court emphasizes that the dismissal of certain claims as ordered herein is *without prejudice* to the United States. *See* United States' Statement of Interest Regarding Def.'s Mot. to Dismiss, ECF No. 24, at 2 ("the United States requests that any order dismissing the Relators' substantive FCA claims specify that such dismissal is without prejudice to the United States' ability to pursue any and all claims that may arise based upon PAE's conduct surrounding the CIVPOL Contract").